# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
April 21, 2010 Session

## IN RE: ANNA S.

**Appeal from the Circuit Court for Washington County**
**No. 27693      Thomas J. Seeley, Jr., Judge**

---

**No. E2009-02664-COA-R3-PT - FILED MAY 6, 2010**

---

This is an appeal from the Trial Court's refusal to terminate the parental rights of Rickie T. ("Father") to his one year old daughter, Anna S. (the "Child"). In June 2008, Rebecca S. ("Mother") became pregnant with the Child. Several months before the Child was born, Mother terminated all communication with Father, notwithstanding Father's numerous attempts to remain in contact with Mother. Shortly after Mother gave birth, she saw Father's sister at a store and told her that she, i.e. Mother, had suffered a miscarriage. In reality, Mother had given the Child up for adoption through Bethany Christian Services of East Tennessee ("Bethany Christian"). Mother also had lied to Bethany Christian and, because of this deception, Bethany Christian was unaware of Father's true identity. Father learned that Mother had given birth to the Child after reading a Notice in the local newspaper stating that Bethany Christian had filed a petition to terminate parental rights and that his parental rights were about to be terminated. Father immediately notified Bethany Christian of his existence and retained counsel. Based on stipulated facts, Bethany Christian and Father filed competing motions for summary judgment. The Trial Court granted Father's motion after finding that there was no clear and convincing evidence of grounds to terminate his parental rights. Bethany Christian appeals, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and JOHN W. MCCLARTY, JJ., joined.

Stewart M. Crane, Loudon, Tennessee, for the Appellant, Bethany Christian Services of East Tennessee.

Timothy W. Hudson, Bristol, Tennessee, for the Appellee, Rickie T.

# OPINION

## Background

The relevant underlying facts in this parental rights termination case are undisputed. The parties stipulated to the pertinent facts and agreed that the stipulation contained all of the information necessary for the Trial Court to determine if grounds existed to terminate Father's parental rights. Since all of the necessary facts were presented to the Trial Court by stipulation, both Bethany Christian and Father filed motions for summary judgment claiming entitlement to a judgment based on the undisputed stipulated facts. Thus, while the parties agreed that summary judgment was appropriate, they disagreed as to which party was entitled to that judgment. The stipulation provides as follows[1]:

Mother and Father met in May 2008, began dating, and were with each other nearly every day until Mother left the relationship within a few days before August 20, 2008. Mother and Father conceived a child in late June 2008. In July 2008, Mother thought she might be pregnant and told Father, who then purchased two or three home pregnancy tests. Mother performed the tests, and they were positive.

Father knew of the results of the home pregnancy tests. Father was happy with the news that Mother was pregnant, wanted to be a father, and shared those feelings with Mother. They discussed marriage.

As a result of her relationship with Father, Mother was a frequent visitor in the home of Father's mother, Vickie H., who lives [in Sullivan County]. Mother also regularly saw and became friends with Father's sister, Dawn D.

In July, 2008, Vickie H. suggested to Mother that she confirm her pregnancy with testing at the Sullivan County Health Department. Mother took a pregnancy test at the Sullivan County Health Department on July 21, 2008. The

---

[1] We have edited the stipulation to delete the paragraph numbers and combine several shorter paragraphs. In addition, we have changed the references in the stipulations to refer to the parents as "Mother" and "Father" and used the initials instead of the full last names when referring to relatives of Mother and Father.

-2-

results of the pregnancy test . . . showed that Mother was pregnant. . . . The Sullivan County Health Department estimated that Mother's child would be born approximately March 10, 2009. Mother showed Vickie H. the report of the results of the pregnancy test . . . and Father saw the report on July 21 or 22, 2008. Father and his family were aware of the estimated due date of the Child.

[In June and July of 2008,] Father told members of his family, co-workers, Mother's mother, and his friends that Mother was pregnant, and that he was the father of the Child. Father never believed that anyone other than he might be the father of [the] Child.

Within a few days prior to August 20, 2008, Mother abruptly left her relationship with Father, and cut off all communication with him. Father wrote a letter to Mother in August or September of 2008, a copy of which is attached . . . as Exhibit B. Father claimed to be the father of the Child. Father wrote another letter to Mother before he wrote Exhibit B, in which he called Mother a "cheating whore" and told her that she was not fit to marry. . . .[2] Father wrote five (5) or six (6) letters to Mother in addition to Exhibits B, C, D, and E . . . , but he did not retain copies of them. . . .

In September, 2008, Mother told Father that she did not want any further contact with him, to leave her alone, and that if she needed anything she would let him know. Despite Mother's wishes, Father continued to write her letters and attempted to call her. When Father tried to talk to her at her work in October 2008, she told him he was stalking her and again told him not to contact her. Mother says she received 10-11 letters from Father from August through November 2008, and phone calls through December, 2008.

Throughout the remainder of 2008 and in January of 2009, Father placed multiple phone calls to Mother's house . . .

---

[2] In Exhibit B, Father apologized for what he said in the previous letter and told Mother that he loved her.

where she lived with her mother. Mother would not speak with him or respond in any way to his communications. Mother's mother told Father not to call and that Mother did not want to have any contact with him. A copy of the records of the calls . . . is attached hereto as Exhibit G. Father says he sent even more letters and continued to attempt to call Mother through March, 2009, using the Tracphone he used during the period he was laid off. Mother denies receiving those additional letters and phone calls.

Father sent Mother $100.00 in September, 2008. He claims that he also sent her $100.00 between November 27 and December 25, 2008. He did not send any more money because he did not know how the money would be used. Father's gross income for calendar year 2008 was Twenty-Two Thousand, Nine Hundred and Sixteen Dollars and Fifty Cents ($22,916.50). . . .

In December, 2008, Mother began to consider adoption because she could not support a third child, and there was no room for another child at her mother's house. Cindy Hawkins of Sullivan County Health Department referred her to Bethany for adoption services.

In December 2008, Father met and conceived a child with Jessica B. Father and Jessica B. began living together in nearby Bristol, Virginia, still reside together, and plan to get married when they have the money for a formal wedding. Their child, named Kara, was born August 29, 2009, and resides with them.

For several days before and after the due date of March 10, 2009, Vickie H. contacted the Bristol Regional Medical Center to see if Mother was there, but the hospital would give out no information.

On January 28, 2009, Mother contacted Bethany Christian Services of East Tennessee ("Bethany"), a licensed child-placing agency, about giving the Child up for adoption. Mother did not want Father or his family to know of the

-4-

adoption, so she deceived Bethany by not giving Bethany the correct name of the father or how he might be notified even though she knew his correct name and where his mother lived. On February 17, 2009, Mother executed an affidavit at Bethany's request. In that affidavit, she intentionally mis-identified the father and how he could be located because she did not want Bethany to find Father and have him learn of her adoption plan. . . . Between February 11, 2009, and March 25, 2009, Julie Ford, an employee of Bethany . . . , used Internet search engines to search for "Richard T." and "Ricky B." She made seven phone calls in response to the results of those searches. She did not find Father [because she did not have his correct name].

Mother gave birth to Anna S. on March 5, 2009 . . . . Neither Father nor his family was informed of the birth of Anna S. (the Child). At the Child's birth, Bethany accepted custody of [the Child] and placed [her] with prospective adoptive parents. . . .

On April 10 or 11, 2009, [Father's sister], Dawn D. saw Mother at the Wal-Mart. . . . Dawn D. asked about the baby. They talked about an hour, during which Mother lied to Dawn D., saying that she had not delivered the child but had miscarried 4-5 months earlier. She lied to hide the truth from Father and his family that she had delivered the child and placed it for adoption with Bethany. The following day, Dawn D. told Father that she had spoken to Mother at Wal-Mart, and that Mother told her she had miscarried. Father believed the report of miscarriage was true. Vickie H. did not believe Mother's claim that she had miscarried and expressed her disbelief to her children . . . .

At all times material to this action, Father did not have a telephone in his own name. His only telephone was a cellular phone provided by his employer. He was not allowed to use the cellular telephone provided by his employer during the period January 29, 2009 - April 23, 2009, when he was laid off from his employment. He used a prepaid cellular telephone during the period when he was laid off.

-5-

On June 8 or 9, 2009, Stewart M. Crane, Attorney for Bethany, filed a Request for Name and/or Address of Father or Child Born Out-of-Wedlock (the PFR Request), using [the correct name of Mother] and "Ricky T." or "Richard T." . . . as possible names of the father, with the Putative Father Registry. In response to the Request, the Putative Father Registry sent two Responses (the PFR Responses) to Mr. Crane . . . reporting that "No person has filed a notice of intent to claim paternity or acknowledgment of paternity of Anna S. . . ."

On June 19, 2009, Bethany commenced this cause by filing its Complaint for Termination of Parental Rights, joining "Ricky T. B. a/k/a Richard T." and Mother as Defendants. Mother's deception caused Bethany to inaccurately allege that Mother, and therefore Bethany, did not know the true name of the possible father of the Child. Her deception also caused Bethany to telephone the wrong male (or males), resulting in Bethany's allegation that it "has been unable to locate any person who will acknowledge being acquainted with Mother." In its Complaint, Bethany prayed that [the biological father] "be given notice of this proceeding by publication of a Non-Resident Notice in the [local] newspaper of general circulation . . . ." The Court granted Bethany's prayer for publication . . . .

On Tuesday, June 30, 2009, [the Notice was published in the local newspaper.] On that same day, Vickie H.'s husband read the Notice in the paper. Vickie H. and her husband informed Father of the Notice that day. The Notice gave Father his first knowledge that Mother's statement that she had miscarried was a lie. Vickie H. called Bethany the evening of Tuesday, June 30, 2009, but its offices were closed.

Father met with two employees of Bethany at Bethany's office . . . on July 1, 2009. He told the employees of Bethany that he could be the father of . . . [the Child] and that he wanted a paternity test. The Bethany employees asked him to execute a Waiver of Interest and Notice to terminate any parental rights he might have in and to [the Child]. He refused to do so and contacted counsel. On July 6, 2009, Julie Ford, a birth parent counselor employed by Bethany, met with Mother to discuss

Father. Julie Ford informed Mother that her lies could damage the adoption of [the Child].

Father filed an Answer and Cross-claim for paternity testing, parentage, and custody in this proceeding on July 15, 2009. Father had never seen the form for filing a Notice of Intent to Claim Paternity or Acknowledgment of Paternity of a Child with the Tennessee Putative Father Registry (PFR) until his deposition in this cause on October 2, 2009. He did not file a Notice of Intent to Claim Paternity or Acknowledgment of Paternity of the Child with the PFR, and had never heard of the PFR until his deposition. . . .

Father has not executed a Voluntary Acknowledgment of Paternity pursuant to the provisions of Tenn. Code Ann. §§ 24-7-115, 68-2-203, 68-2-302, and 68-2-305 . . . . He has not signed such a sworn acknowledgment pursuant to the law of any other state, territory, or foreign country.

Father and Mother have never been married, have never attempted to marry, and Father . . . [has not] adopted [the Child]. At all times material to this action, Father knew [where] Mother was residing . . . . At the time of the filing of the Complaint for Termination of Parental Rights in this cause, Father had not:

> (a) commenced a proceeding for the determination of the parentage of the Child,
>
> (b) been adjudicated by a court of Tennessee or any other state or territory of the United States to be the father of the Child,
>
> (c) been recorded on the Child's birth certificate as the Child's father,
>
> (d) openly lived with the Child,
>
> (e) entered into a foster care plan acknowledging paternity of the Child,

(f) paid any part of the medical expenses arising from the birth of the Child,

(g) paid any monies toward the support of Mother or the Child during the last four months Mother was pregnant with the Child, other than $100.00 between November 27 and December 25, 2008, which he claims to have paid, but which Mother denies receiving,

(h) paid any monies toward the support of the Child or Mother since the birth of the Child, [or]

(i) maintained regular visitation or other contact with the Child.

After filing his Answer and Cross-claim, Father asked Bethany to permit him to visit [the Child]. Bethany denied his request pending entry of an Order of Parentage of the Child.

Father and the Child submitted DNA samples for paternity testing . . . for which testing Father paid. By Affidavit dated September 21, 2009, [the DNA test results showed] a likelihood of 99.994% that Father is the biological father of [the Child]. . . .[3]

During the period of Mother's pregnancy, Father resided [at three different addresses.] Father did not notify Mother when he moved from [the second location]. . . .

In 2009, Father was employed . . . from January 1, 2009 - June 19, 2009, excluding the period from January 29, 2009 - April 23, 2009, during which period he was laid off because of lack of business on the part of his employer. . . . Father received unemployment benefits in the amount of $231.00 per week from February 7, 2009, until April 18, 2009. . . .

_____

[3] An Order of Parentage was entered on October 29, 2009, and Father was given very limited temporary visitation at that time.

At all times pertinent, Mother knew that Father could be located through his mother or his employment . . . where his mother and other family members worked, but she hid this information from Bethany. (footnotes added)

Based on the stipulated facts, the Trial Court concluded that clear and convincing evidence of grounds to terminate Father's parental rights had not been presented. The Trial Court, therefore, granted Father's motion for summary judgment. According to the Trial Court:

Bethany Christian contends that Father abandoned the child (T.C.A. §§ 36-1-102(1)(A)(iii) and 36-1-113(g)(1)), failed to pay any prenatal, natal, and postnatal birth expenses (T.C.A. § 36-1-113(g)(9)(A)(i)), and failed to file a petition to establish paternity within 30 days of "notice of alleged paternity" by the mother or file a claim of paternity with the putative father registry prior to or within 30 days of the birth of the child (T.C.A. §§ 36-1-113(g)(9)(A)(vi) and 36-2-318(e)(3)).

The grounds for termination must be proved by "clear and convincing evidence." T.C.A. § 36-1-113(c)(1). . . . Both the grounds for abandonment and failure to pay birth expenses incorporate the element of intent. Abandonment in this case means that Father either "*willfully* failed to visit or *willfully* failed to make reasonable payments toward the support of the mother" in the four (4) months prior to the birth of the child. T.C.A. § 36-1-102(1)(A)(iii). The failure to pay birth expenses "*without good cause or excuse*" must also be proven by clear and convincing evidence. T.C.A. § 36-1-113(g)(9)(A)(i).

\* \* \*

Based on the . . . [stipulated] facts and especially the deceitful and mendacious conduct of Mother, this Court is constrained to find that there is *not* clear and convincing evidence that Father willfully failed to visit or make reasonable payment to Mother in the four (4) months prior to the birth of the child. Father did send limited monies to Mother. . . . Although such payments would not normally be considered reasonable, his willingness to pay was thwarted by Mother's refusal to acknowledge his letters

-9-

and his telephone calls . . . , all of which resulted in her accusing him of stalking and telling him to quit trying to contact her. Notwithstanding that, Father continued to call her through January 2009, but Mother would not talk to him. Father's immediate action in going to Bethany Christian's office two days after the first newspaper publication notice and shortly thereafter hiring counsel and filing his Answer and Counterclaim claiming to be the father belie any willful intent to abandon on his part. Further, Mother's conduct in refusing contact with Father, lying about who was the father of the child to Bethany Christian, and stating to Father's sister that she had miscarried, would "excuse" Father's not paying birth expenses. There is not, under these circumstances, clear and convincing evidence that Father failed, "without good cause or excuse" to pay a reasonable share of the child's birth expenses.

Plaintiff lastly contends that Father's rights should be terminated because, although he knew [Mother] was pregnant with his child, he did not file with the putative father registry before the child's birth or otherwise seek to declare paternity in a timely fashion after notice of the alleged paternity. T.C.A. § 36-1-113(g)(9)(A)(vi). There is no question that, upon learning of the child's birth, Father immediately notified Bethany Christian claiming paternity and intervened in this termination proceeding. . . . This Child's live birth was concealed from Father by Mother. Father filed with this Court well within thirty (30) days after he had notice of the live birth of this Child. His notice came from the newspaper publication.

The Court thus finds that there is not clear and convincing evidence to find that Father did not file to establish paternity of the child within thirty (30) days of notice that he was the father of the child born.

Because the Trial Court concluded that none of the alleged grounds to terminate Father's parental rights had been proven by clear and convincing evidence, it entered summary judgment for Father and pretermitted the issue of whether terminating Father's parental rights was in the Child's best interest. Bethany Christian appeals

challenging the Trial Court's determination that grounds to terminate Father's parental rights had not been proven by clear and convincing evidence.[4]

## Discussion

As stated previously, the parties are in agreement that the Trial Court was presented with sufficient stipulated evidence to determine if grounds for terminating Father's parental rights existed. Our Supreme Court reiterated the standard of review for cases involving termination of parental rights in *In re F.R.R., III*, 193 S.W.3d 528 (Tenn. 2006). According to the Supreme Court:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*Id.* at 530.

Bethany Christian argues that the Trial Court incorrectly applied Tenn. Code Ann. § 36-1-113(g)(9)(A) which provides, in relevant part, as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive,

---

[4] In its Statement of the Issues, Bethany Christian simply states the issues as being (1) whether the Trial Court erred when it granted Father's motion for summary judgment, and (2) whether it erred when it denied Bethany Christian's motion for summary judgment. Bethany Christian fails to specify in its Statement of the Issues exactly what the Trial Court did that Bethany Christian claims was error by the Trial Court in its granting Father summary judgment.

so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

\* \* \*

(9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:

(i) The person has failed, without good cause or excuse, to pay a reasonable share of prenatal, natal, and postnatal expenses involving the birth of the child in accordance with the person's financial means promptly upon the person's receipt of notice of the child's impending birth;

(ii) The person has failed, without good cause or excuse, to make reasonable and consistent payments for the support of the child in accordance with the child support guidelines promulgated by the department pursuant to § 36-5-101;

\* \* \*

(vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3) . . . .[5]

With respect to the grounds alleged in Tenn. Code Ann. § 36-1-113(g)(9)(A)(i) and (ii), the facts are quite clear that Mother intentionally lied to both Father and Bethany Christian. Notwithstanding Father's repeated attempts to stay in contact with Mother during her pregnancy and to assist her if needed, Father's attempts were consistently rebuked by Mother. Because Mother steadfastly refused to have any contact with Father, there was nothing to indicate to Father that Mother was, yet again, lying when she told his sister that

---

[5] Father does not argue that Tenn. Code Ann. § 36-1-113(g)(9) does not apply to him in this case.

-12-

she had miscarried. Because Mother refused any contact with Father in the months before the Child was born and because Father had been informed that Mother had miscarried, he cannot be deemed to have failed "without good cause or excuse" to pay a reasonable share of Mother's prenatal, natal, and postnatal expenses. Quite simply, Father was not aware that there were any such expenses and, in fact, had been deliberately misled into believing that such expenses did not exist. It is for the very same reason that Father cannot be deemed to have failed "without good cause or excuse" to make reasonable and consistent child support payments.[6] This is what the Trial Court found, and the evidence does not preponderate against these findings.

Next, Bethany Christian argues that Father's parental rights should have been terminated because Father failed "to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother . . . ." For purposes of terminating parental rights, a child is defined as "any person or persons under eighteen (18) years of age." Tenn. Code Ann. § 36-1-102(13). We agree with the Trial Court that, for purposes of this statute, the Legislature contemplated that the thirty days would begin to run after the father received notice of alleged paternity and that this notice period begins, at the earliest, when the Father receives notice of the birth of the child. The facts fully support the Trial Court's conclusion that Father did not receive this notice until he read the legal notice in the local newspaper and that he thereafter acted swiftly to protect his rights.[7]

This is an unfortunate case in many ways. It is unfortunate that, due to Mother's blatant and calculated lies, Father has had to retain counsel to protect his fundamental parental rights. It is unfortunate that, due to Mother's blatant and calculated lies, Bethany Christian was deceived into believing that it had done what it needed to do in order to notify the biological father of the planned adoption. It is unfortunate that, due to

---

[6] In its Statement of the Issues, Bethany Christian does not list as an issue whether Father abandoned the Child pursuant to Tenn. Code Ann. § 36-1-113(g)(1) for failure to pay child support. To the extent that Bethany Christian does attempt to raise this as an issue, we, likewise, conclude that there was no willfulness on the part of Father not to pay child support and, therefore, he cannot be deemed to have "abandoned" the Child pursuant to this statutory provision.

[7] As quoted previously, Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) provides that parental rights can be terminated if "[t]he person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3)." Again, we note that Bethany Christian does not specifically raise in its Statement of the Issues any issues regarding whether Father complied with Tenn. Code Ann. §§ 36-2-318(j) or 36-1-117(c)(3), assuming they apply. We therefore consider any such issues waived. Having said that, we nevertheless point out that Father's failure to register with the putative father registry would be excused in this case since he had been incorrectly informed that the child had never been born.

Mother's blatant and calculated lies, the Child has been living with prospective adoptive parents and forming a bond with them and that relationship must now come to an end through no fault of the prospective adoptive parents. Because of Mother's behavior, there are no true winners in this case.

We conclude that the evidence does not preponderate against the Trial Court's findings and ultimate conclusion that there was no clear and convincing evidence to terminate Father's parental rights. The judgment of the Trial Court is affirmed.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Circuit Court for Washington County solely for collection of the costs below. Costs on appeal are taxed to the Appellant, Bethany Christian Services of East Tennessee, and its surety, for which execution may issue, if necessary.


_____
D. MICHAEL SWINEY, JUDGE